**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TERESA PETRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 5246** |
| | ) | |
| **NORTHWESTERN MUTUAL** | ) | **Magistrate Judge Finnegan** |
| **LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

On September 6, 2011, Troy Pawelko, then-husband of Plaintiff Teresa Petry, decided to let his $1.75 million dollar life insurance policy lapse to avoid premium payments that he no longer could afford. The next day Northwestern Mutual Life Insurance Company ("Defendant") sent a letter confirming his request to stop the automatic monthly premium payments. Pawelko never sought to reinstate the policy before the 31-day grace period ended on October 28, 2011, so the policy ceased to be in force after this. Over a month later, on December 3, 2011, Pawelko took his own life. Three weeks after Pawelko's death, Plaintiff contacted Defendant by telephone to make a claim under the policy. A claims analyst told her no benefits would be paid since coverage terminated before Pawelko's death, and the policy could not be reinstated after death. Plaintiff made no mention of having express mailed a reinstatement payment coupon and check for the past due premium earlier that same day.

The express mailing went to Defendant's P.O. Box where a different employee authorized the policy's reinstatement under the mistaken belief that Pawelko was alive

and was seeking reinstatement. Letters to Pawelko followed, thanking him for continuing coverage and (later) alerting him to overdue premiums. Plaintiff opened and read these letters to Pawelko, but otherwise ignored them. Four months after the policy was reinstated, Plaintiff (through counsel) sent a demand letter for the policy proceeds. When Defendant instead sent her a refund check for the premium payment with a letter apologizing for the confusion and "miscommunications" resulting from the erroneous processing of that payment, Plaintiff returned the check and filed a lawsuit for breach of contract.[1] Her primary argument is that Defendant impliedly waived its right to refuse to reinstate the policy and to deny benefits based on the policy's lapse by processing her check and retaining her funds until she demanded the policy proceeds. Now before the Court are the parties' cross-motions for summary judgment. For the reasons discussed below, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

## BACKGROUND[2]

### A. The Policy

In October 2008, Pawelko applied for life insurance coverage from Defendant. (Doc. 43 ¶ 2). His application was submitted through Ross Kasner, who was then an independent contractor and financial representative authorized to sell Defendant's insurance products. (Doc. 24 ¶¶ 1-2). Defendant approved Pawelko's application

---

[1]     Defendant removed the case to federal court (based on diversity of citizenship), and the parties then consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

[2]     For ease of reference, page numbers cited in this opinion are drawn from the CM/ECF docket entries at the top of the filed documents.

effective January 27, 2009, issuing a policy with death benefits of $1,750,000. (Doc. 43 ¶ 3).

Pawelko owned the policy and was also the insured. (*Id.*). The policy named Plaintiff (then his fiancée) as the beneficiary of 85.7% of the proceeds ($1,499,750), and Mary E. Stewart, Pawelko's ex-wife, as the beneficiary of 14.3% of the proceeds ($250,250). (Policy, Doc. 24-1, at 4). Benefits were payable "on the death of the Insured while this policy is in force" and "[s]ubject to the terms and conditions of the policy." (*Id.* at 6). The policy provided that it could terminate for a number of reasons, including unpaid premiums. (*Id.*). If premiums were not paid by the due date, the policy remained "in full force" during the 31-day grace period such that benefits would be paid if an insured died during this period. (*Id.* at 8) If premiums were not paid within the grace period, however, the policy terminated as of the premium due date. (*Id.*). After termination, the policy could be reinstated under certain conditions, as follows:

> If this policy terminates as provided in Section 3.4, it may be reinstated within three years after the due date of the overdue premium. All unpaid premiums (and interest as required in this section) must be received by the Company while the Insured is alive and before the Expiry Date.
>
> In addition, for the policy to be reinstated more than 31 days after the end of the grace period:
>
> - evidence of insurability must be given that is acceptable to the Company; and
>
> - all unpaid premiums must be paid with interest from the due date of each premium. Interest is at an annual effective rate of 6%.

(*Id.*). After obtaining the policy in October 2008, Pawelko elected to pay his premiums on a monthly basis, establishing an "Insurance Service Account," or "ISA," with

Defendant.  Under the ISA, monthly premium payments were made through automatic electronic fund withdrawals from Pawelko's bank account.  (Doc. 43 ¶ 4).  As discussed below, however, these automatic payments ceased after September 2011, at Pawelko's direction.

## B. Termination of the Policy (September 27, 2011)

Pawelko worked in finance for several years, including as a Director of Finance at J.P. Morgan, and as the owner of his own securities brokerage business.  (Doc. 43 ¶¶ 5-6).  At his peak, he earned as much as $3 million a year.  (*Id.*).  Because of the collapse of the financial markets, Pawelko lost his position with J.P. Morgan.  He eventually was forced to relocate from Illinois to Indiana to take a job outside the financial services industry, accepting a marketing position with a salary of $125,000 a year plus benefits.  (*Id.*).  On March 21, 2011, he obtained life insurance coverage through his new employer, and named Plaintiff as the sole beneficiary of the $125,000 policy. (Doc. 43 ¶ 10).  Shortly thereafter, on May 31, 2011, Pawelko and Plaintiff exchanged emails in which Pawelko said (among other things) that "damn near all of our money is gone." (*Id.* at ¶ 11).

On September 6, 2011, Pawelko called his insurance agent, Kasner, and directed him to terminate the automatic monthly premium payments for the 1.75 million dollar policy with Defendant, and let it lapse according to its terms.  (Doc. 43 ¶ 13).[3]  As

---

[3]      According to Kasner, when Pawelko gave this directive, he explained that he no longer wanted to pay premiums for the policy because of financial difficulties. (Doc. 43 ¶ 13). Kasner memorialized this conversation in contemporaneously dictated and recorded notes. Plaintiff asserts that Pawelko's statements to Kasner are inadmissible hearsay. (*Id.*).  However, at least as to the instruction to Kasner to stop the automatic monthly premium withdrawals from his bank account, the statement is a directive in the nature of a verbal act not offered for its

a result, Defendant terminated the ISA and automatic withdrawals from Pawelko's bank account, and sent a letter to Pawelko dated September 7, 2011, confirming that it had done so "as requested." (*Id.* at ¶¶ 15-16). The confirmation letter also stated that, since Pawelko's last premium payment had been made on August 27, 2011, the policy was paid through September 27, 2011, and the grace period for late payment would end on October 28, 2011. (*Id.* at ¶ 16). No payment was made before the end of the grace period, so the policy lapsed on September 27, 2011. (*Id.* at ¶ 17).

**C.    Pawelko's Death (December 3, 2011) and Defendant's Letter to Pawelko Inviting Reinstatement (December 4, 2011)**

On December 3, 2011, Pawelko took his own life. (Doc. 43 ¶ 30). The next day—but before anyone affiliated with or employed by Defendant was made aware of the death—Defendant mailed a letter to Pawelko as the "Policyowner". (*Id.* at ¶ 31). Printed in capital letters at the top were the words, "POLICY LAPSE INFORMATION." (December 4, 2011 Letter, Doc. 26-7, at 2). The letter stated that Defendant had not received past due premiums for the policy, that coverage had ended, and that a final dividend check would be sent separately. (*Id.*). After this, the letter stated:

> **However, you can apply to restore full protection and policy values, provided the insured is living. To do so, you must take this easy step:**

---

truth. *See* Fed. R. Evid. 801(c); *Freeman v. Metropolitan Life Ins. Co.* 468 F. Supp. 1269, 1271 (W.D. Va. 1970) (deceased insured's statement to a deponent that he wanted to cancel group insurance policy was not hearsay). Such a statement (stop the withdrawals) can neither be true nor false since it is a directive or request. *United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996) (a request or an order is not hearsay). Moreover, in Plaintiff's reply, she appears to abandon her hearsay objection by agreeing that Pawelko "attempted to cancel his policy before his suicide" by stopping his premium payments. (Doc. 47, at 7). Even were this evidence to be excluded as hearsay, the outcome of the summary judgment motions would be the same.

- Return the enclosed reinstatement payment coupon along with your payment for the amount due before December 26, 2011.

(*Id.*) (emphasis in original). The letter then said that absent payment by this date, the insured would be required to submit evidence of insurability, which could include a medical examination and medical records. (*Id.*). Finally, the letter stated that any questions should be directed to Pawelko's financial representative, Ross Kasner with McTigue Financial Group, Inc., or to Defendant's customer service representatives. (*Id.*).

Enclosed with the one-page letter was a document entitled "Reinstatement Payment Notice," which listed Troy R. Pawelko as the insured. (Doc. 26-7, at 3). It said the "Reinstatement Payment Required" was $1,172.90, and the due date for such payment was December 26, 2011. (*Id.*). Below this, the notice stated (in part):

**IMPORTANT**

This policy has lapsed and the most recent protection it provided has ended. If this was not your intention, you now have the opportunity to restore coverage.

The required payment [$1,172.90] will be accepted if received by the due date shown above [December 26, 2011], provided the insured is still alive.

(*Id.*). The notice ended with a detachable payment coupon containing this direction: "Please return this portion with your check made payable to Northwestern Mutual." It also cautioned: "Please use a separate sheet of paper for correspondence related to your bill. Any writing on this coupon will be missed in automated processing." (*Id.*).

**D.     Telephone Call with Ross Kasner**

Sometime between December 12, 2011 and December 19, 2011, Plaintiff opened the December 4, 2011 letter addressed to Pawelko.  (Doc. 43 ¶ 33).  This was how she learned about the policy.  (Petry Dep., Doc. 42-8, at 21).  According to Plaintiff, she never read the contents of the letter, but merely "glanced" at it and believed it to be a bill for a policy that Pawelko had obtained for his ex-wife.  (Doc. 43 ¶¶ 33, 55).  Plaintiff then called Kasner to report Pawelko's death.  (Doc. 42-8, at 25).  Kasner informed her that she had been a beneficiary of the policy (along with the ex-wife) but Pawelko had cancelled the policy to save money.  (*Id.* at 26; *see also* Doc. 24 ¶ 9).

The parties disagree about the remainder of the discussion between Plaintiff and Kasner.  According to Plaintiff, she told Kasner only that she had received a "bill" (not a reinstatement coupon), and Kasner encouraged her to return it with payment and to call Defendant's home office to set it up because of the death.  (Doc. 42 ¶ 40).   Kasner reportedly told her that "maybe we weren't over the grace period time," and suggested she make a claim under the policy.  (Doc. 43 ¶ 40).

Kasner recalled the discussion differently. He said he told Plaintiff that the grace period had ended and the policy had lapsed, that she would likely not be paid any benefits, and that he did not believe it was possible to reinstate the policy after Pawelko's death.  (Doc. 24 ¶¶ 9-11).  Plaintiff then asked if she should still try to pay the past due premium and reinstate the policy.  Kasner said he responded that there was

not "any harm in trying," but told her to ask Defendant's employees in the home office about this. (*Id.* at ¶ 10).[4]

### E.     Telephone Call with Trista Neal (December 21, 2011)

On December 21, 2011, Plaintiff called Defendant's home office to report Pawelko's death and to attempt to make a claim under the policy.  (Doc. 43 ¶ 35).  Representative Trista Neal in the claims department spoke with Plaintiff and made a communication log entry in Defendant's computer system summarizing the conversation as follows:

> Theresa [sic] Petry wanted to know if we will pay the claim since the client committed suicide one day before the policy lapsed.[[5]]  I went ahead and set up the claim case since the client died before the lapse was noted in CSS.  Please call the client back to discuss if we will pay the claim or not or what they would need to do at this point if anything to re-establish the payment.

(*Id.*).  Another of Defendant's employees made a communication log entry the morning after Plaintiff's call with Neal, referencing Pawelko's obituary.  (Doc. 46 ¶ 19).

### F.     Plaintiff Express Mails Reinstatement Payment Coupon and Check

The next day, December 22, 2011, Plaintiff went to the post office and express mailed to Defendant the reinstatement payment coupon sent to Pawelko on December 4, 2011.  She also included a check in the amount of $1,172.90 for the premium that was due.  (Doc. 43 ¶ 47).  The check was dated December 20, 2011 and was drawn on the account of "Troy Pawelko and Teresa Petry Pawelko."  (*Id.* at ¶ 49).  The package

---

[4]       For purposes of considering Defendant's motion for summary judgment, this Court accepts Plaintiff's version of the conversation with Kasner.

[5]       As noted earlier, the policy actually lapsed on September 27, 2011 when Pawelko did not pay the overdue premium within the 31-day grace period ending on October 28, 2011.  Pawelko's December 3, 2011 death occurred well after the policy's lapse.

containing the check and reinstatement coupon bore a mailing label with "T. PAWELKO" handwritten into the "FROM" space. (*Id.* at ¶ 50). Plaintiff did not disclose in a written note or elsewhere in the package that the mailing was from Plaintiff rather than Pawelko, or that Pawelko had died. (*Id.* at ¶ 51). The post office mailing label reflects that the package was accepted by the post office at 11:01 a.m. on December 22, 2011. (USPS Express Mailing Label, Doc. 22-4, at 2).

## G.   Telephone Call with Claims Analyst Laurie Dolehide

Later in the day on December 22, 2011, Defendant's claims analyst, Laurie Dolehide, called Plaintiff to follow up on the call with Trista Neal from the day before. (Doc. 43 ¶ 43).[6] Dolehide told Plaintiff that the policy's coverage had terminated before Pawelko died, that the policy could not be reinstated after death, and that Plaintiff could not pursue a claim for benefits under the policy because no benefits were payable due to its termination. (*Id.*). Dolehide prepared an electronic case note concerning the conversation that said (in relevant part):

> I explained the policy was paid to 9/27/2011. The 31 day grace period would have expired on October 28, 2011, and that the policy was not in force when the Insured passed on 12/3/2011. She [Plaintiff] was questioning because they rec'd [sic] the request to reinstate the policy on 12/4/2011, one day after the Insured died. I further explained that an Insured had to be alive in order to reinstate a policy.

(Claim Overview, Doc. 25-1, at 2). Although Plaintiff made known to Dolehide her desire to reinstate the policy during this call, (Doc. 43 ¶¶ 43-44), she never informed Dolehide (or Trista Neal) that she mailed a premium check after Pawelko's death, (*Id.* at

---

[6]     According to Plaintiff's phone records, this telephone call occurred at 3:36 p.m. (Petry Telephone Records, Doc. 22-5, at 13). Dolehide's electronic case note indicates that the conversation was "late in the afternoon." (Doc. 25-1, at 2).

56, 58). According to Plaintiff, when she mailed that check, she believed she merely was paying an overdue bill on a lapsed policy and did not send the check in an effort to receive benefits or reinstate the policy. (Doc. 46 ¶ 4; *see also* Doc. 42-8, at 40 ("Q. Is it fair to say you were hoping maybe somehow by mailing the check in you might still be able to get benefits? A. No. Q. That wasn't why you did it? A. No.")).

After being informed by Dolehide that the grace period had expired and she could not reinstate the policy due to Pawelko's death, Plaintiff called Kasner again because the information was not "making any sense." Kasner recommended she speak with an attorney. (Doc. 42-8, at 32, 34).[7] Plaintiff did not discuss the situation further with any of Defendant's employees; she did not want to call Dolehide or Neal back and assumed that if there was a problem she would get her money back. (*Id.* at 40).

On December 27 and 28, 2011, Defendant's claims employees continued working on the claim file regarding Pawelko's death, making notations regarding Plaintiff's attempt to make a claim. (Doc. 46 ¶¶ 23-24). They also made notes in Defendant's computer system regarding the date and manner of Pawelko's death, and the payment and lapse history of the policy. (*Id.*). Eventually, Defendant's employees closed the claim file. (*Id.*).

## H. Defendant Processes Reinstatement Coupon and Premium Check

Meanwhile, on December 23, 2011, Defendant's retail lockbox vendor received the premium check and reinstatement payment coupon that Plaintiff had express mailed

---

[7] Plaintiff's phone records confirm that she called Kasner after speaking with Dolehide. (Doc. 22-5, at 13). Kasner testified that he had a handful of conversations with Plaintiff but did not recall the specifics, and his declaration does not discuss what was said during this particular call. (Kasner Dep., Doc. 42-11, at 24).

to the P.O. Box the day before. Because Defendant's offices were closed from December 23 to December 26, 2011, the automated reinstatement request was not transmitted for processing until December 27, 2011. (Doc. 43 ¶ 59). Although the payment was technically received after the December 26th due date, Defendant generally accepted payments received up to three days late to allow for delays in the mail. (Doc. 46 ¶¶ 11-13). As a result, Defendant's employee, Melissa Schultz, approved reinstatement of the policy on December 28, 2011 without requesting any additional information regarding Pawelko's insurability. (*Id.*). When she approved the Policy's reinstatement, Schultz did not know that Pawelko was dead or that the reinstatement payment was submitted by Plaintiff rather than Pawelko. (Doc. 28 ¶ 7). She could have learned about Pawelko's death had she accessed Defendant's computer system and read notes made by Defendant's claims employees. (Doc. 48 ¶¶ 28-30).

On December 28, 2011, after Schultz approved the Policy's reinstatement, Defendant mailed an automatically generated confirmation letter to Pawelko, thanking him for choosing to continue his insurance coverage. (Doc. 43 ¶ 63; Dec. 28, 2011 Letter, Doc. 28-1, at 2). The letter advised Pawelko that future premium payments would be paid through an Insurance Service Account, and advised him that the company looked forward to "working with you in the future." (*Id.*). Plaintiff received and reviewed this letter, but did not call Defendant to request benefits under the reinstated policy because she did not think of it. (*Id.* at ¶64; Petry Dep., Doc. 42-9, at 9). She also read a number of other letters that Defendant sent to Pawelko in the months that

followed concerning his reinstated policy. (Doc. 42-8, at 41-42; Doc. 43 ¶ 66). These mailings included:

- A January 6, 2012 "Billing Notice" indicating Pawelko's payment on January 4, 2012 "was returned unpaid by your bank because your account was closed." (Doc. 42-6, at 13). This notice requested Pawelko to mail a replacement check "to continue your Insurance Service Account." (*Id.*).

- A January 11, 2012 "Urgent Billing Notice" stating that Pawelko's past due and current monthly premium payments were due no later than January 27, 2012. (*Id.* at 15).

- A March 2, 2012 notification to Pawelko that his Insurance Service Account was closed since two monthly payments had not been received. (*Id.* at 17).

- A March 4, 2012 letter, stating that Pawelko's policy had lapsed, but he could restore coverage "provided the insured is living". (*Id.* at 10). The letter explained that the deadline for payment was March 27, 2012 and, if received, the "policy will be added back to Insurance Service Account (ISA) 0640291 with ISA payer Troy R. Pawelko." (*Id.*)

At no time did Plaintiff contact Defendant to say that letters were mistakenly being sent to someone who was deceased. (Doc. 42-8, at 41-42). She did, however, seek litigation counsel for this lawsuit in January and February 2012. (Jan. 30 2012 – Feb. 9, 2012 emails, Doc. 22-2, at 3-4). As discussed later, counsel sent a demand letter for the policy proceeds on April 10, 2012.

## I.    Defendant Investigates Premium Payment Shortage for Pawelko's Policy

On March 2, 2012, Defendant's customer service representative, Kiryana Thadison, sent an email to Ross Kasner, noting that after the policy was reinstated, Pawelko's ISA incurred a shortage due to overdue premiums. (Doc. 46 ¶ 34; Mar. 2, 2012 – Mar. 7, 2012 emails, Doc. 45-1, at 12). The email further explained that Thadison planned to apply an uncashed dividend check that had been sent to Pawelko toward the ISA shortage, and asked Kasner to tell Pawelko to destroy the uncashed

check in his possession. (*Id.*). Kasner's assistant replied to Thadison's email, informing her that Pawelko was deceased, and recommending that Thadison speak with someone in Defendant's "death claims area." (*Id.*).

Thadison had no further communications with anyone regarding these emails. (Doc. 46 ¶ 35). According to Thadison, she searched Defendant's computer system and, upon discovering that there had been a claim file opened regarding Pawelko's death, determined that no further action was required. (Doc. 45 ¶ 3). Thadison also stated that she does not have access to the communications contained in the claim file, and thus was not aware that the premium shortage was caused by the policy being reinstated after Pawelko's death. (*Id.* at ¶¶ 3-4).

**J.      Plaintiff Demands Payment of Benefits**

On April 10, 2012, almost four months after Plaintiff mailed the policy reinstatement payment of $1,720.90, her attorney sent a letter to Defendant demanding payment of $1,499,750 within 30 days as benefits owed to Plaintiff under the policy. (Doc. 43 ¶ 68; *see also*, Doc. 1-1, at 36-38). That letter stated (in part):

> Ms. Petry mailed a check via overnight courier service to Northwestern Mutual's home office in Milwaukee on December 20, 2011, for the full amount due (see Exhibit C). The next day, she telephoned your company, speaking to Ms. Trista Neal, one of your customer relations representatives, and advised Ms. Neal of her husband's death. *Notably, Ms. Petry also told Ms. Neal of Northwestern Mutual's December 4, 2011 letter and that she had mailed a check for that amount the previous day.*
>
> *                    *                    *
>
> After reinstating the Policy via the December 20, 2011 check, Ms. Petry notified two different Northwestern Mutual employees of her late husband's death. In both conversations she made clear her intent to make a claim. Northwestern Mutual cashed the December 20, 2011 check after both conversations took place, retained those funds with

knowledge of Mr. Pawelko's death, and for months has continued to send correspondence requesting additional payments to continue the Policy.

(Doc. 1-1, at 36-37) (emphasis added).

Defendant responded with a letter from claims analyst Dolehide on May 1, 2012. (Doc. 43 ¶ 69; *see also* May 1, 2012 Letter, Doc. 25-2, at 2-4). Defendant denied the claim for benefits and enclosed a check to refund Plaintiff's premium payment. (*Id.*; *see also* Check No. 136813, Doc. 25-3). The letter stated that the policy had never effectively been reinstated since Pawelko was already deceased when Plaintiff sent the premium payment. (Doc. 25-2, at 3). It further explained that the December 28, 2011 letter (stating the policy had been reinstated) and the other mail sent to Pawelko were "miscommunications" resulting from confusion. (*Id.*). Finally, the letter said Defendant's employees who were responsible for processing the reinstatement payment and coupon had no knowledge of Pawelko's death. (*Id.*).

Plaintiff's counsel returned the uncashed check to Defendant and filed this lawsuit. (Doc. 43 ¶ 69; *see also* June 1, 2012 Letter, Doc. 25-4). Like the demand letter, the Complaint inaccurately alleged that Plaintiff had notified Defendant's employee of sending a premium payment for the purpose of reinstating the policy. Specifically, she alleged that "[o]n December 21, 2011, Plaintiff called Defendant's claims processing office. In this conversation with Defendant's customer service representative, Plaintiff *gave Defendant notice of her payment to reinstate the policy* and to give [sic] notice of her intention to submit a claim on the Policy because of her husband's death." (Doc. 1-1 ¶ 16) (emphasis added). Plaintiff now acknowledges that her timeline was incorrect, and she did not mail the premium check until December 22,

2011 which was *after* her call with Trista Neal. (Doc. 47, at 14). In addition, she acknowledges that she never told Neal or Dolehide that she was going to (or had) mailed the reinstatement coupon and a premium check to Defendant. (Doc. 42-8, at 35).[8]

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At the summary judgment stage, a court's function is not to "weigh the evidence and determine the truth of the matter" but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute "about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 249. If the evidence is merely colorable … or is not significantly probative … summary judgment may be granted." *Id.* at 249-50 (citations omitted).

In making the determination of whether there is a genuine issue for trial, courts construe all facts and "draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party." *Continental Cas. Co. v. Northwestern Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) (quoting *Franklin v. City of Evanston*, 384 F.3d

---

[8]    Defendant cites these misstatements and certain other facts in support of its affirmative defense that Plaintiff used false pretenses to induce it to cash the premium check and reinstate the Policy. (Doc. 4, at 12; Doc. 44, at 14). In considering Defendant's motion for summary judgment, the Court assumes that Plaintiff did not employ any false pretenses and that any misstatements were accidental.

838, 843 (7th Cir. 2004)).   But a court is "not required to draw every conceivable inference from the record, and mere speculation or conjecture will not defeat a summary judgment motion."   *Id.*   (internal citations omitted).   The party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Since the parties here have filed cross motions for summary judgment, each party must show with respect to its own motion that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law.   *Continental Cas. Co.*, 427 F.3d at 1041 (citing *Franklin*, 384 F.3d at 843; FED. R. CIV. P. 56(c)).

**B.     Defendant's Motion for Summary Judgment**

**1.     Coverage Was Not in Force When Insured Died**

Defendant argues that it did not breach the insurance contract by declining to pay benefits since the policy lapsed before the insured's death due to non-payment of premiums.  (Doc. 20, at 7-9).  When construing a contract, the courts' primary charge is to enforce the terms of the parties' agreement as written. *See Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33 (2007); *Va. Sur. Co. v. N. Ins. Co. of N.Y.*, 224 Ill. 2d 550, 556 (2007).  If the language of the policy is clear and unambiguous, the plain language of the policy must be enforced.  *Nieder v. Jackson*, No. 10 C 6766, 2011 WL 3798224, at *3 (N.D. Ill. Aug. 22, 2011) (citing *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998)).   According to the insurance contract between Pawelko and Defendant, Defendant was only required to "pay the Life Insurance Benefit on the death of the Insured [Pawelko] while this policy is in force."  (Doc. 24-1, at 6; Section 1.1)  Premiums were to be paid by the due date, however, the contract allowed a "grace

period" of 31 days to pay an overdue premium, and during this grace period, the "policy will be in full force." (*Id.* at 8; Section 3.4).   But the contract provided that "[i]f the premium is not paid within the grace period, the policy will terminate as of the due date." (*Id.*).

It is undisputed that Pawelko deliberately stopped paying premiums after his last payment on August 27, 2011.   When Pawelko failed to pay the next premium on the due date of September 27, 2011, the 31 day grace period began.   Once the grace period ended on October 28, 2011, the policy ceased to be in force.   Since the policy was not in force when Pawelko died more than a month later on December 3, 2011, no benefits were payable.   As Defendant argues, "[t]he basic *quid pro quo* of an insurance company's agreement to provide insurance coverage is the insured's payment of a premium."   (Doc. 20, at 7) (quoting *Edwards v. State Farm Ins. Co.*, 980 N.E.2d 87, 89 (Il. App. Ct. 1st Dist. 2012)).   Pawelko's decision to stop paying premiums after August 27, 2011 entitled Defendant to deny payment of benefits for Pawelko's death on December 3, 2011.

### 2.     Beneficiary Cannot Reinstate Life Policy of Deceased Owner/Insured

The facts in this case are unusual in that—even though the policyowner and insured (Pawelko) deliberately allowed the coverage on his life to lapse—his beneficiary sought to reinstate that policy.   And she did so well after his death.   This Court agrees with Defendant that Pawelko, as sole owner of the insurance contract, was the only person authorized to exercise all policy rights, including that of reinstatement provided

the contractual conditions for doing so were satisfied. (Doc. 24-1 at 7; Section 2.1).[9]

Until and unless Pawelko, as owner, exercised his contractual right to reinstate the policy, it remained a lapsed policy that afforded no coverage. Since Pawelko chose to allow the policy to lapse and never opted to reinstate it while he was alive, the policy was not in force at his death.

Plaintiff nonetheless caused Defendant's employees to process paperwork to reinstate the policy after Pawelko's death (unintentionally by her testimony) when she took what she believed was an overdue bill but in fact was a reinstatement coupon and express mailed it to Defendant's P.O. Box with a premium check. Neither Plaintiff's status as a beneficiary nor her access to Pawelko's mail gave her authority to exercise Pawelko's right to reinstate the policy. She was not the owner of the policy and therefore she lacked authority to exercise Pawelko's contractual rights after (or before) his death.[10]

---

[9]     Section 2.1 states (in relevant part): "All policy rights may be exercised by the Owner, the Owner's successor, or the Owner's transferee without the consent of any Beneficiary." (*Id.*). Pawelko could not have a successor under the policy because he was both owner and insured. (*Id.* at 7, Section 2.3, stating "If the Owner is not the Insured, the Owner may name or change a successor owner who will become the new owner upon the Owner's death."). According to the policy, "[a]fter the death of the Insured, policy rights may be exercised only as provided in Section 7." (*Id.*). Section 7 pertains to beneficiaries and payment of the life insurance benefit, and does not give a beneficiary the right to reinstate the owner's policy. (Doc. 24-1, at 10-12).

[10]     Plaintiff understandably does not argue that a new contract was formed (between herself and Defendant) when Defendant deposited her premium check and reinstated the policy. "In order to constitute a contract between two parties, there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting." *Bank of Marion v. Robert Fritz, Inc.*, 9 Ill. App. 3d 102, 108 (5th Dist. 1973), *aff'd*, 57 Ill. 2d 120 (1974). As discussed above, based on Plaintiff's testimony, she did not intend to enter into a contract with Defendant when she paid the overdue "bill." And Defendant deposited the premium check believing it was contracting with (a still living) Pawelko to provide future coverage on his life.

### 3. Defendant Did Not Waive Right to Deny Benefits Based on Lapse of Policy and to Deny Reinstatement of Coverage on Deceased Insured

Even if the insurance contract gave a beneficiary authority to reinstate a lapsed policy, Defendant argues that the conditions precedent for reinstatement were not satisfied here. Under the contract's terms, a lapsed policy could be reinstated only if all unpaid premiums were received "while the Insured is alive." (Doc. 24-1, at 8, Section 4). Consistent with the contract terms, the December 4, 2011 letter that Defendant mailed to Pawelko with the reinstatement coupon said Pawelko could "apply to restore full protection and policy values, provided the insured is living." It also said the required premium payment "will be accepted if received by the due date … provided the insured is still alive." (Doc. 26-7, at 2).

There is no dispute that Plaintiff mailed the premium payment on December 22, 2011 and it was received by Defendant shortly after this. In other words, the late premium was mailed to and received by Defendant well after Pawelko's death on December 3, 2011. Regardless, Plaintiff argues that Defendant—through its actions—impliedly waived its right to deny her benefits based on the policy's lapse for non-payment of premiums, as well as its right to deny reinstatement after the insured's death. According to Plaintiff, the implied waiver occurred because (1) Defendant reinstated the policy despite knowing of Pawelko's death; (2) Defendant retained Plaintiff's premium check, indicating acceptance of that payment; and (3) Plaintiff clearly communicated to Defendant her intent to get retroactive coverage for Pawelko's death. (Doc. 41, at 6-16).

a.    **Standard for waiver:**   Before turning to these arguments, this Court addresses the parties' disagreement about the requirements for waiver. Plaintiff observes that in the insurance context, the forfeiture of a policy is disfavored and so waivers may be readily found and can even be unintentional. (Doc. 47, at 8). Plaintiff further notes that waiver generally is "not expressed or intentional, but rather it is implied from the conduct of the insurer or its agents." (*Id.*) (quoting *Van Hulle v. State Farm Mut. Auto. Ins. Co.*, 44 Ill. 2d 227, 230 (1969)). While Defendant agrees that a waiver can be implied from an insurer's conduct, it contends that waiver still must be knowing and intentional, and so any implied waiver "must rest on conduct that admits of no other interpretation or explanation than a deliberate decision to waive rights." (Doc. 49, at 12).

This Court agrees that, under Illinois law—which governs this diversity matter— waiver is a "voluntary and intentional relinquishment of a known and existing right." *Universal Fire & Cas. Ins. Co. v. Jabin*, 16 F.3d 1465, 1470 (7th Cir. 1994) (citing *Nat'l Tea Co. v. Commerce & Indus. Ins.*, 119 Ill. App. 3d 195, 204-205 (1st Dist. 1983)). An implied waiver arises when the insurer's conduct is "inconsistent with any intention other than to waive it." *Lumbermen's Mut. Cas. Co. v. Sykes*, 384 Ill. App. 3d 207, 219 (1st Dist. 2008); *see also Home Ins. Co. v. Cincinnati Ins. Co.*, 213 Ill. 2d 307, 326 (2004) (citing *Liberty Mut. Ins. Co. v. Westfield Ins. Co.*, 301 Ill. App. 3d 49, 53 (1st Dist. 1998)). "The party claiming an implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 317 Ill. App. 3d 119, 130 (2d Dist. 2000) (citing *Ciers v. O.L. Schmidt Barge Lines, Inc.*, 285 Ill. App. 3d 1046, 1050 (1st Dist. 1996)). "Where there is no

dispute as to the material facts and only one reasonable inference can be drawn, it is a question of law as to whether waiver has been established." *Home Ins. Co.*, 213 Ill. 2d at 326 (citing *Liberty Mut. Ins. Co.,* 301 Ill. App. 3d at 53).[11]

      **b.**   **Application of Waiver Standard:**   Applying the standard for implied waiver in this case, Plaintiff must prove that Defendant—through clear, decisive and unequivocal conduct—manifested an intention to (a) waive its right to deny $1,750,000 in death benefits based on the lapse of the policy, and (b) waive its right to deny reinstatement of the policy when the overdue premium of $1,720.90 was received over three weeks after the insured's death. In determining whether Defendant waived its rights, the Court examines the facts in the light most favorable to the Plaintiff and draws all inferences in her favor. In other words, it assumes that Plaintiff did not use false pretenses to induce Defendant to process the premium check and reinstate the policy after Pawelko's death.

Even when the facts are construed in Plaintiff's favor, no jury reasonably could find an implied waiver by Defendant under the circumstances presented here. Significantly, when Plaintiff directly asked whether she could reinstate the policy after Pawelko's death, claims adjuster Laurie Dolehide unequivocally stated (on December

---

[11]      Some Illinois courts have said implied waiver is also "an equitable principle invoked to further the interests of justice" and that "the insured need only demonstrate such acts as would make it 'unjust, inequitable or unconscionable' to allow the insurer to assert the [policy] defense." *Lumbermen's Mut. Cas. Co.*, 348 Ill. App. 3d at 219-20 (quoting *Mollihan v. Stephany*, 52 Ill. App. 3d 1034, 1041 (1st Dist. 1977); *Vasilakis v. Safeway Ins. Co.*, 46 Ill. App. 3d 369, 374 (1st Dist. 1977)). The Seventh Circuit has also observed that in Illinois and certain other states "implied waiver is a confusing hybrid of waiver and estoppel." *Estate of Luster v. Allstate Ins. Co.*, 598 F.3d 903, 911 (7th Cir. 2010) (citing *Tibbs v. Great Central Ins. Co.*, 57 Ill. App. 3d 866 (5th Dist. 1978)). *But see Lumbermen's Mut. Cas. Co.*, 384 Ill. App. 3d at 218 ("Although the terms 'waiver' and 'estoppel' are sometimes conflated, particularly in the insurance context, they are actually distinct legal doctrines.") (citing *Twin City Fire Ins. Co. v. Old World Trading Co.*, 266 Ill. App. 3d 1, 12 (1st Dist. 1993)).

22, 2011) that the policy had already terminated and could *not* be reinstated.  This was consistent with both the policy's terms and Defendant's December 4, 2011 letter to Pawelko which said he must be alive to reinstate his life insurance coverage.  Such a position is understandable, for as Defendant aptly observes, an insurer might reasonably waive policy conditions to reinstate coverage "in order to continue a commercial relationship with a living insured," but in reinstating life insurance coverage on an already deceased person, there could be no prospect of future premiums.  (Doc. 20, at 13).  Waiver by the insurer here would only result in the acceptance of a single late premium of $1,720.90 in exchange for the requirement to pay $1,750,000 in death benefits, which Defendant rationally declined to do.

Despite unequivocal statements in the policy, the December 4, 2011 letter, and the telephone call with Plaintiff on December 22, 2011 that the policy could *not* be reinstated after the insured's death, Plaintiff asserts that Defendant's conduct here, including the cashing of the premium check and processing of the reinstatement coupon that she mailed, manifested an intention to waive its rights to declare the policy lapsed and to deny reinstatement.  This Court disagrees.  It is undisputed that the employee who approved the policy reinstatement request (Melissa Schultz) merely applied a company policy regarding accepting late payments.  Schultz did not know Pawelko had died three weeks earlier and that the premium check was mailed by his beneficiary who was seeking retroactive coverage.  Instead she believed Pawelko was alive and was the one seeking reinstatement.  Indeed, after reinstating the policy, Defendant sent a letter to Pawelko thanking him for continuing his coverage, followed by other letters regarding subsequent unpaid premiums.  These letters plainly show that Defendant's employees

involved with the reinstated policy mistakenly believed Pawelko to be alive.[12]  Therefore, their conduct in depositing the premium check and reinstating the policy does not evidence any clear, unequivocal, decisive, voluntary or intentional waiver of the reinstatement requirement that an insured be living when his policy is reinstated.

Plaintiff argues that it is irrelevant that Schultz lacked knowledge of Pawelko's death when she authorized the reinstatement because other employees (such as claims staff Trista Neal and Laurie Dolehide) knew of the death, as did Kasner, an agent of Defendant.  In addition, information about Pawelko's death was available to Schultz in the Defendant's "CaseTracker" computer system.  Plaintiff therefore asserts that "[t]he mere fact that [Schultz] chose the path of the ostrich and did not look at the notes cannot absolve the Defendant corporation from its knowledge of [Pawelko's] death and [Plaintiff's] intent to obtain retroactive coverage."  (Doc. 41, at 9).  Plaintiff asks the Court to reject Defendant's "attempts to construct an image of its personnel as independent arms of an octopus, each knowing just little enough to be blameless for its acts" and asserts that "it is what Defendant as an *entity* knew or should have known that is determinative."  (Doc. 47, at 7).

Plaintiff's argument might have some force if the dispute were about whether the insurer received adequate notice of a claim.  But the focus here is on Defendant's *intent* and whether an intention to waive its rights can fairly be implied from Defendant's conduct.  *Cas. Ins. Co. v. E.W. Corrigan Const. Co., Inc.* 247 Ill. App. 3d 326, 332 (1st

---

[12]    It is also undisputed that the billing employee, Thadison, who contacted Kasner about the unpaid premiums and thus learned of Pawelko's death, did not know Plaintiff submitted reinstatement papers after the death.  Hence, after confirming that the claims personnel already knew of Pawelko's death, she did not realize there was a need for further action.

Dist. 1993) ("The issue of whether the insurer has waived a defense is not analogous to whether it has received adequate notice of an occurrence. Waiver of a defense requires an intent implied from the insurer's conduct."). This Court agrees with Defendant that accepting Plaintiff's collective or institutional knowledge argument would allow a finding of a knowing and voluntary waiver to be premised on nothing more than negligence or miscommunication and confusion. (Doc. 49, at 10-11). It is undisputed that when Schultz received the premium check and reinstatement coupon and caused the policy to be reinstated, she believed Pawelko was still alive.

One week earlier, however, when there was *no* confusion, Defendant (through Dolehide) made absolutely clear that the policy had lapsed and coverage on the life of Pawelko could *not* be reinstated after his death – just as was stated in the December 4, 2011 letter. Moreover, after Plaintiff communicated (through her attorney's demand letter) that *she* sent the premium check and did so to obtain retroactive coverage for Pawelko's death, Defendant refunded the payment and reiterated (again) that the policy could not be reinstated after Pawelko's death. Given the totality of Defendant's conduct under the circumstances here, no reasonable jury could find that Defendant intended to waive its right to deny reinstatement and agreed to retroactive coverage for Pawelko's death.

c. ***Van Hulle* Case:** In support of her implied waiver theory, Plaintiff argues that the Illinois Supreme Court's decision in *Van Hulle v. State Farm Mutual Automobile Insurance Company*, 44 Ill. 2d 227 (1969) is binding precedent that is dispositive of the waiver issue. Because this case involving a lapsed auto policy is clearly distinguishable, the Court disagrees.

As an initial matter, unlike Pawelko, the insureds in *Van Hulle* did not deliberately cease premium payments so that their insurance policy would lapse. Instead, they intended to continue coverage and took steps to accomplish this *before* the loss. This was shown when, after receiving a notice that their auto policy had lapsed but could be reinstated by paying the overdue premium, one of the insureds (the wife) wrote and signed a check and placed that check with the lapse notice in an envelope addressed to State Farm. She did not immediately mail the envelope, however, and a few days later, was in an automobile collision and died. That same day, January 22, 1965, the envelope with the premium check was recovered from the wreckage of the vehicle and mailed to State Farm, and the insurance agent was informed of the accident. 44 Ill. 2d at 228-29. The next day, the insured husband called State Farm and advised a claims officer of the accident and the tendering of the check. In addition, a few days later the insured told the agent that he wanted the premium check returned if State Farm would not grant retroactive coverage for the accident and the agent then conveyed this to State Farm in a written memorandum. *Id.* at 229.

State Farm cashed the premium check but mailed a refund a short time later with a letter stating that the policy could not be reinstated. Nonetheless, the court ruled that "[c]onsidering the elapse of 22 days and the eventual cashing of the check," this was "sufficient for acceptance, regardless of the fact that the insurer attempted to refund the premium." *Id.* at 232. The court went on to hold that "to constitute waiver an intent to get retroactive coverage must be communicated to the insurer." It found that the insured had communicated this intent when he gave "notice of the conditional tendering of the check" to the agent. *Id.*

The court next considered the "propriety of applying a rule of waiver under the circumstances of this case" and observed that automobile insurance "is no longer a private contract merely between two parties" and "[m]any persons injured and disabled from automobile accidents would become public charges were it not for financial assistance received from the insurance companies." *Id.* at 232 (quoting *Simmon v. Iowa Mut. Cas. Co.*, 3 Ill. 2d 318, 322 (1954)). In finding waiver to be appropriate, the court remarked that forfeiture of an insurance contract for nonpayment of premium "is not favored in the law, and courts are prompt to seize upon circumstances which indicate a waiver of forfeiture." *Id.* at 232-33 (citing *M.F.A. Mut. Ins. Co. v. Quinn*, 259 S.W.2d 854 (Mo. Ct. App. 1953)).

*Van Hulle* is distinguishable for a number of reasons. First, the policy considerations identified above concerning auto insurance policies do not apply to the lapse of a life insurance policy, so it is unlikely that the court would have seized upon facts from which to imply a waiver in the case at hand. Second, the insured in *Van Hulle* did not deliberately stop paying premiums so the policy would lapse, as did Pawelko. This Court agrees with Defendant that "[w]hile *Van Hulle* provides an avenue for avoiding the draconian consequences of an inadvertent *forfeiture* of coverage, it does not justify unwinding the consequences of an insured's deliberate *cancellation* of coverage." (Doc. 49, at 4).

Finally, the requirements for implied waiver announced in *Van Hulle* are not satisfied here. Unlike the insured in *Van Hulle* who clearly communicated to the insurer that he was tendering the premium for the purpose of gaining retroactive coverage (and even demanded the return of the check if coverage were refused), Plaintiff said nothing

when she mailed the premium. Indeed, it was not even apparent that she was the source of the check since the envelope was from "T. Pawelko" and the check was drawn on Pawelko's joint account with Plaintiff. In addition, contrary to the allegations in her demand letter, Plaintiff now admits that she did *not* give notice to Defendant's claims representative that she even mailed a premium check, much less that she did so to seek policy reinstatement after Pawelko's death. As for her discussions with Ross Kasner, Plaintiff testified that she told him she was going to pay what she described as an overdue bill, and Kasner encouraged her to return it with payment since the policy possibly was still in the grace period.[13] Kasner also told her to contact Defendant directly regarding the policy and she did so, resulting in the conversation with claims analyst Dolehide in which Plaintiff was told the policy could *not* be reinstated.

Plaintiff would be in a better position to argue implied waiver based on *Van Hulle* had she included a letter with the premium check, stating that Pawelko had died three weeks earlier but she (his widow and beneficiary) was sending the check for the purpose of getting retroactive coverage and claiming death benefits. Alternatively, she could have done what she alleged in her demand letter and informed Defendant's claims representative that she had mailed a premium check to reinstate the policy or was planning to do so. Because Plaintiff failed to communicate her intent when she sent the premium check, resulting in confusion about who sent it and why, no reasonable jury could find that Defendant accepted a premium check "tendered for the purpose of covering" a loss that already had occurred (Pawelko's death). *Van Hulle*, 44

---

[13] As discussed earlier, the policy remained "in force" during the grace period, so had Pawelko died during that time, Plaintiff would have been entitled to benefits. (Doc. 24-1 at 6, 8).

Ill. 2d at 230.  Nor could it find that "an intent to get retroactive coverage [was] communicated to the insurer" as required in *Van Hulle*.  *Id.* at 232.  This Court agrees with Defendant that the holding in *Van Hulle* "applies only where the policyowner attempted to keep the policy in force *prior* to the loss" and "expressly advises the insurer that a late payment is being submitted in the hopes of obtaining retroactive coverage." (Doc. 44, at 2).

   **d.** ***Krumwiede* and *Horace Mann* Cases:** Plaintiff argues that it is enough for an implied waiver that Defendant "knew or should have known" that Plaintiff sought retroactive coverage and she did not need to "expressly" state her intent.  (Doc. 41, at 12).  In support, she cites two cases following *Van Hulle*—*Krumwiede v. Bankers Life & Casualty Company*, 95 Ill. App. 3d 861 (3d Dist. 1981), and *Horace Mann Insurance Company v. Brown*, 13 Ill. App. 3d 330 (4th Dist. 1973).  Both cases are clearly distinguishable.

  As Plaintiff describes it, the *Horace Mann* court found the insured had notified an insurer of his intent to receive retroactive coverage for a known loss based on the mere "payment of lesser premium to continue coverage and subsequent payment of remainder."  (Doc. 41, at 12).  But this is a simplistic and misleading view of the case.  In *Horace Mann,* the court found that the policyowner did not deliberately let his automobile coverage lapse, but instead "clearly showed his intention to continue coverage" by mailing premium payments for his policies a month and a half before they were due.  13 Ill. App. 3d at 331.  The insurer received the payments on August 2, 1968 (they were due September 18), but because the premium rates increased in August, the early payment was $34.60 short.  Nonetheless, the insurer held the funds until

28

September 26, 1968 before mailing a refund with a letter stating that partial payments could not be accepted. Rather than declaring a lapse of the policy (so the insured would know he needed to get substitute auto coverage), the letter stated: "It is our suggestion that you immediately reissue a check or checks in the full amount to a*ssure continuous coverage."* *Id.* (emphasis added).

At the same time*,* the insurer modified its internal records to change the due date for the premium from September 18 to October 12, 1968. *Id.* at 332. As directed, the insured then sent money orders for the full payments on October 11, 1968, and the insurer received them the next day. In the interim, however, the insured was in an auto accident (on October 7, 1968), and promptly gave notice to the insurer by telephone the next day. *Id.* The insured then heard nothing for six weeks, until November 27, 1968, when the insurer returned the money orders and, for the first time, informed the insured that the policy had lapsed on September 18, 1968, leaving him without any coverage after that date. *Id.* at 333.

Not surprisingly, the *Horace Mann* court concluded that the insurer had agreed to accept a late premium (when it promised "continuous" coverage if another check was sent) but "had second thoughts" after learning of the insured's accident. *Horace Mann Ins. Co.*, 13 Ill. App. 3d at 337. In finding a waiver, the court also expressed concern that the insured had relied to his detriment on the insurer's actions and statements by not getting substitute auto coverage prior to the accident. *Id.* The facts are quite different in the case at hand where a lapse *was* explicitly declared after the insured deliberately ceased paying his premiums. Moreover, Pawelko never sought to reinstate his policy prior to the loss event (his death). Finally, Plaintiff was not induced by

Defendant's depositing of her premium check to forego seeking other life insurance coverage on the already deceased Pawelko.

Plaintiff also relies on *Krumwiede v. Bankers Life & Casualty Company*, 95 Ill. App. 3d 861 (3d Dist. 1981)*,* for the proposition that "notification of loss and claim to insurer was sufficient notification of intent to get retroactive coverage, even after insurer expressly stated policy could not be reinstated but retained a check." (Doc. 41, at 12). Again, Plaintiff oversimplifies *Krumwiede*, which is readily distinguishable from this case. First, prior to the loss event in *Krumwiede,* the insured clearly demonstrated an intent to continue the coverage: after being notified of the lapse of his health insurance policies, he mailed a reinstatement form and premium check. 95 Ill. App. 3d at 862. About two weeks after mailing the check (and three days before the insurer received it), the insured was suddenly and unexpectedly hospitalized. *Id.* The insurer was notified of this hospitalization within a few days and a claim form was submitted. It was not until a few weeks later, however, that the insurer wrote to say that it would *not* reinstate the health insurance policy until the insured was released and completely recovered. *Id.* Nonetheless, the insurer "neither applied the check to prospective coverage nor refunded it until 40 days after cashing it." *Id.* at 865.

Applying *Van Hulle*, the *Krumwiede* court found that the insurer waived the forfeiture of the policy. Even though the insured had not communicated an intention to gain retroactive coverage for the hospitalization when he mailed the premium check, the court noted that it would have been impossible to do so where the check was mailed *before* the insured fell ill. 95 Ill. App. 3d at 865. Under such circumstances, the court found it was sufficient for an implied waiver that the insurer was informed of the intent to

seek retroactive coverage soon after the hospitalization, and before cashing the premium check, particularly given how long the insurer then held the insured's funds after learning of this intent. *Id.*

In contrast to the circumstances in *Krumwiede*, nothing precluded Plaintiff from communicating her intent to seek retroactive coverage on the date she mailed the premium check (or shortly thereafter) since the loss already had occurred. When Plaintiff finally communicated this intent almost four months later through her lawyer's demand letter, Defendant refunded the premium, apologized for the confusion, and informed Plaintiff (again) that the policy could not be reinstated after Pawelko's death. There is no basis for finding an implied waiver from such conduct.

      **e.**    ***Nieder* Case:**  The facts in the pending case are more similar to those presented in *Nieder v. Jackson National Life Insurance Company*, No. 10 C 6766, 2011 WL 3798224, at *5 (N.D. Ill. Aug. 22, 2011). There the beneficiary under a life insurance policy sent a letter to the insurer seeking death benefits after the death of the policyowner and insured (her ex-husband). *Id.* at *1. The insurer wrote back that benefits would not be paid because the policy lapsed due to non-payment of premium. *Id.* After receiving this letter, the ex-wife sent a premium payment to the insurer, and her check was cashed. *Id.* She then argued (in part) that the insurer waived its right to declare the policy lapsed once it cashed her check. *Id.* at *5.

In granting the insurer's motion to dismiss, the *Nieder* court declined to find a waiver. The court first recognized that "[u]nder Illinois law, a waiver 'arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right.'" *Id.* at *5 (quoting *Home Ins. Co.*, 213 Ill. 2d at 326). The court next observed

that, "[i]n cases where an insurer was found to have waived declaring a policy lapsed after accepting a late payment, it was not simply due to the negotiation or disposition of the check, but also due to the fact that the check was held for a considerable amount of time or the insurer 'manifested its intentions to reinstate the policy.'" *Id.* (quoting *McMillon v. Old Republic Life Ins. Co.*, 33 Ill. App. 3d 658, 661 (5th Dist. 1975)). Finally, the court noted that "[i]n order for the acceptance of a late payment to constitute a reinstatement of the policy, the insurer must take some action that is inconsistent with the claim that it did not accept the payment." *Id.* It described such conduct as including "statements, acts, or courses of conduct which indicate that the insurer considered the policy as still existing despite the fact that it had lapsed." *Id.* (citing *Times Ins. Co. v. Vick*, 250 Ill. App. 3d 465, 468 (1st Dist. 1993)). No such evidence existed in *Nieder*, the court said, since plaintiff could "show only that there was an automatic deposit" of her check followed by a prompt refund, and she could not provide proof of insurability of the insured, since a deceased person is not insurable. *Id.* As a result, the court found that the plaintiff was unable to demonstrate that the insurer waived its right to declare the policy lapsed. *Id.*

Plaintiff argues that her case is distinguishable from *Nieder* because Defendant's employee approved reinstatement of the policy without requiring proof of insurability, and the premium payment was not refunded until four months later. (Doc. 47, at 4-5). But the reinstatement and delay in refunding the premium admittedly stemmed from confusion and a mistaken belief that Pawelko was alive, as shown (in part) by Defendant's repeated letters to him about the policy after his death. For this reason, as in *Nieder,* the evidence does not come close to demonstrating an implied waiver, and

particularly where claims adjuster Dolehide explicitly denied Plaintiff's request for retroactive coverage on the same day that Plaintiff mailed her premium check.[14]

### 4. Reinstatement is Foreclosed Under the Known Loss Doctrine

In addition to arguing that Plaintiff cannot satisfy the requirements for waiver, Defendant asserts that the known loss doctrine (or fortuity principle) precludes the reinstatement of life insurance coverage on Pawelko after his death. (Doc. 20, at 9; Doc. 40, at 5-6). As one Illinois court has observed, "[b]y its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill. 2d 90, 104 (1992) (citing *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981) ; *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1041 (D.C. Cir. 1981) ). Consequently, under the known loss doctrine as applied by Illinois courts, if an insured knows that it will suffer or has suffered a loss and purchases an insurance policy to cover that loss, the loss is uninsurable "unless the parties intended the known loss to be covered." *Outboard Marine Corp.,* 154 Ill. 2d at 104 (citing *Prudential-LMI Com. Ins. v. Superior Court*, 51 Cal.3d 674, 699 (1990); *Vyn v. Nw. Cas. Co.*, 47 Cal.2d 89, 92-93 (1956); 6B J. Appleman & J. Appleman, Insurance Law & Practice § 4265, at 97 (1979)).

Defendant argues that since Plaintiff knew Pawelko was dead when she attempted to reinstate the policy, the loss was uninsurable under the known loss doctrine and she cannot collect death benefits. Plaintiff disagrees and asserts that the

---

[14] Plaintiff undoubtedly would have received a faster refund had she not waited almost four months to make a claim under the reinstated policy. But she testified that even if Defendant had sent her check back a week after she mailed it, she would not have cashed it anyway "because I would have hired an attorney." (Doc. 42-8, at 40).

known loss doctrine does not apply to the reinstatement of an existing policy, and may only be invoked against the issuance of prospective coverage. (Doc. 41, at 16-17; Doc. 47, at 3-5). Plaintiff provides no authority (or logic) in support of such a limitation. Instead Plaintiff relies on the implied waiver cases discussed earlier from which she argues that the doctrine does not apply because Defendant knew Pawelko was deceased, and reinstated the policy anyway. (Doc. 41, at 17; Doc. 47, at 5). While the known loss doctrine does not apply where "the parties intended the known loss to be covered[,]" this Court has already found that Defendant did not demonstrate through its conduct that it intended to provide retroactive coverage for Pawelko's death. Therefore, the Court finds that the known loss doctrine applies. Plaintiff paid a premium to reinstate life insurance coverage on a person who she knew was already dead, so the loss was uninsurable and she is not entitled to death benefits.[15]

### C. Plaintiff's Motion for Summary Judgment

Since no reasonable jury could find a breach of contract occurred here even when the facts are construed in the light most favorable to Plaintiff, Plaintiff's cross-motion for summary judgment is necessarily doomed. When the facts are construed in the light most favorable to Defendant, a jury could reasonably find that Plaintiff used false pretenses to induce Defendant to reinstate the policy, all in an effort to obtain death benefits to which she was not entitled. For example, based on Ross Kasner's

---

[15] Defendant also argues that Plaintiff cannot enforce the "reinstatement" of the policy because Pawelko did not consent to the coverage. (Doc 44, at 3-4) (citing *Bajwa v. Metro. Life Ins. Co.*, 208 Ill. 2d 414, 438-39 (2004)). Since this Court is granting summary judgment to Defendant on other grounds, it declines to consider whether this public policy argument applies in a situation where the insured previously consented to a now-cancelled policy and is already dead when reinstatement of that prior coverage is sought.

testimony, a jury could conclude that he not only advised Plaintiff to contact Defendant directly about the policy (they agreed on this), but also told her that the policy lapsed before Pawelko's death and likely could *not* be reinstated. In addition, a jury might disbelieve Plaintiff's testimony that she never read the single-page letter accompanying the reinstatement coupon that stated in more than one place (and in bold font) that the insured had to be living for the policy to be reinstated.

Further, a jury could infer from the evidence that Plaintiff deliberately sought to create the false impression that Pawelko was alive and requesting reinstatement of the policy when she express mailed the reinstatement coupon and check in an envelope from "T. Pawelko" and made no mention of this mailing to claims adjuster Dolehide during their conversation only four hours later. In the same vein, a jury could conclude that Plaintiff backdated the premium check (as Defendant argues and she denies) and lied (rather than innocently misstated) in her demand letter that she mailed the check on December 20th and then notified Defendant's claims representative of this mailing the next day. Lastly, a jury might infer that Plaintiff waited almost four months to demand benefits under the reinstated policy, and never requested Defendant to stop sending letters to her deceased husband in the interim, because she wanted the Defendant's confusion to continue so that it would retain her money until she demanded benefits rather than quickly refunding it.

Plaintiff describes the discrepancies in her various statements as "trivial" and a product of the "whirlwind" she was going through after Pawelko's death. (Doc. 47, at 14). But as Defendant notes, the misstatements in her demand letter were made months later, and while she was represented by counsel. Plaintiff also argues that any

such "discrepancies" had "no bearing" on Defendant's "decision making process," so were immaterial. (Doc. 47, at 15). Finally, she asserts that there is "no evidence" of "false pretenses at play" and that she was "completely forthcoming in discussing [Pawelko's] death with Defendant." (*Id.* at 15). All of these determinations, however, must be made by a jury since there is sufficient evidence from which a jury reasonably could reject Plaintiff's assertions. If the jury instead found that Plaintiff used false pretenses to create confusion and induce Defendant to deposit her $1,720.90 check and reinstate Pawelko's policy so she could demand $1,499,750 in benefits, the jury would be entitled to reject Plaintiff's waiver argument and breach of contract claim.

In sum, while the disputed facts concerning Plaintiff's motive and intent need not be resolved to grant Defendant's motion for summary judgment, they must be resolved for Plaintiff to establish a claim for breach of contract and overcome the affirmative defense of false pretenses. Therefore, Plaintiff's cross motion for summary judgment is denied.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 40) is denied, and Defendant's Motion for Summary Judgment (Doc. 18) is granted. Judgment will be entered in favor of Defendant.

ENTER:

Dated: March 10, 2015.

SHEILA FINNEGAN
United States Magistrate Judge